## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARGO KLINE,

     Plaintiff,

v.

ATLANTA HAWKS, LLC,

     Defendant.

**CIVIL ACTION FILE**

**NO. 1:18-CV-1132-MHC-JSA**

## ORDER

This employment discrimination case comes before the Court on the Final Report and Recommendation ("R&R") of the Magistrate Judge [Doc. 35] recommending that the Court grant in part and deny in part Defendant's Motion for Summary Judgment [Doc. 21]. The Order for Service of the R&R [Doc. 36] provided notice that, in accordance with 28 U.S.C. § 636(b)(1), the parties were authorized to file objections within fourteen (14) days of the receipt of that Order. Defendant filed timely objections to the R&R ("Def.'s Objs.") [Doc. 39].

I.    **BACKGROUND**[1]

Plaintiff Margo Kline ("Kline") (a Caucasian female) began working for Defendant Atlanta Hawks, LLC (the "Hawks" or "Defendant") on June 29, 2012, in the position of Coordinator, Community Development, with a starting salary of $40,000.02.  Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s Resp. to Def.'s SMF") [Doc. 27] ¶ 10.  Kline interviewed with and was hired by Andrea Carter ("Carter") (an African American female), Vice President for Corporate Social Responsibility and Inclusion, who was her direct manager the entire time Kline was employed with the Hawks.  Id. ¶ 11.

As the Coordinator of Community Development, Kline was responsible for helping to organize community events, working with Hawks alumni to promote the team brand, managing the alumni program and the community development intern, and assisting in the creation of initiatives to further alumni and community programming with the organization.  Id. ¶ 15.  Kline also supported the Hawks' most notable franchise alumnus, Dominique Wilkins ("Wilkins"), Vice President

---

[1] Neither party takes issue with the Magistrate Judge's recitation of the facts, which the Court has reviewed for plain error.  Having found no plain error, the facts and procedural history of this case as set forth in the R&R are adopted by the Court and are fully incorporated herein by reference unless otherwise noted and supplemented.

of Basketball and Director of Alumni, by managing his scheduling, appearances, and correspondence.  Id. ¶ 16.  Wilkins was never Kline's supervisor and did not provide input for her performance evaluations or any disciplinary decisions; instead, Kline's supervisor, Carter, designated Kline to work with Wilkins as part of Kline's job and Carter continued to manage Kline's overall job performance. Id. ¶ 17.  Wilkins reported directly to Steve Koonin ("Koonin"), CEO of the Hawks.  Def.'s Resp. to Pl.'s Statement of Add'l Material Facts ("Def.'s Resp. Pl.'s Add'l MF") [Doc. 30] ¶ 22.

In the summer of 2014, David Lee ("Lee") (an African American male), Executive Vice President of External Affairs and Executive Director of the Atlanta Hawks Foundation, became the manager of Kline's department, which was included under the umbrella of External Affairs.  Pl.'s Resp. to Def.'s SMF ¶ 20. Kline continued to report to Carter, but Lee became Carter's manager.  Id. ¶ 21. During that same time period, Kline was promoted to Senior Coordinator, Corporate Social Responsibility, and her salary increased from $42,125.16 to $46,500.22.  Id. ¶ 24.

Carter gave Kline an "exceeds expectation" rating for her performance reviews from 2014 through June 30, 2016.  Id. ¶ 37.  In 2016, Kline was promoted to Manager, Corporate Social Responsibility, which included another raise from

3

$47,895.12 to $54,000.00.  Id. ¶ 40.  All of Kline's promotions and salary increases were approved under the management and leadership of her direct manager, Carter, and Carter's direct manager, Lee.  Id. ¶ 41.

In March 2016, Nzinga Shaw ("Shaw") (an African American female), the Chief Diversity and Inclusion Officer, offered Kline an opportunity to serve on the Diversity and Inclusion Council ("the Council").  Id. ¶ 30.  After completing her initial term on the Council, Kline either resigned or did not apply for a second term.  Id. ¶ 31.  Kline reported to Shaw on or about February 3, 2017, that she no longer wanted to be a member of the Council because Kline believed the organization was "talking the talk and not walking the walk" with regard to diversity.  Id. ¶ 32.

## A.   Alleged Racial or Sexist Incidents

### 1.   2014 Lee Statement That He Wanted to Hire a Black Female

Kline alleges that, in 2014, Lee stated that he wanted to hire a Black female for the Basketball Development Coordinator position that ultimately was filled by Rashauna Hobbs (an African American female).  Id. ¶ 78; Tr. Dep. of Margo Kline (Jan. 17, 2019) ("Kline Dep.") [Doc. 21-5] at 118-20.  Jon Babul ("Babul") (a Caucasian male), Director of Basketball Programs, selected Hobbs for the position of Basketball Development Coordinator.  Pl.'s Resp. to Def.'s SMF ¶ 79; Kline

Dep. at 120-21.  Kline did not apply for this position and does not dispute that

Hobbs was qualified for and excelled in the position.  Pl.'s Resp. to Def.'s SMF

¶ 80; Kline Dep. at 119-20, 134.

### 2.      March 2015 College Basketball Discussion

In March of 2015, during a group discussion about the NCAA "March

Madness" college basketball tournament, Kline alleges she proclaimed that

Georgia State University was going to upset its opponent, but Lee disagreed,

deferring to Kline's male colleagues, Duane Ferrell ("Ferrell") and Babul for their

opinions.  Pl.'s Resp. to Def.'s SMF ¶ 81; Kline Dep. at 94-96.  Kline describes

this conversation as the group having a light-hearted conversation talking

basketball within the comradery of their department.  Pl.'s Resp. to Def.'s SMF

¶ 82; Kline Dep. at 94-96.  Ultimately, when Georgia State University did win the

game, Kline alleges that Lee wrote on his marker board, "Margo is sometimes

right," and left it on the board for everyone to see, which Kline found

condescending and hurtful.  Pl.'s Resp. to Def.'s SMF ¶ 83; Kline Dep. at 95.

### 3.      Lee's Condescending Comments

Kline alleges that on as many as five separate occasions, Lee would defer to

the opinions of her male colleagues, Ferrell and Babul, during alumni meetings and

state: "I'm going to let the men who know basketball handle that."  Pl.'s Resp. to

Def.'s SMF ¶ 88; Kline Dep. at 90-91.  Lee denies ever saying that any decisions

or opinions should be left to the men.  Pl.'s Resp. to Def.'s SMF ¶ 89.  Kline also

alleges that Lee referred to individual women in the department as "kid," which

she found to be condescending.  Id. ¶ 90; Kline Dep. at 97.  Lee denies singling out

any woman with the term "kid" and states that it is an upstate New York

colloquialism, not a gender reference.  Pl.'s Resp. to Def.'s SMF ¶ 91.  On another

occasion, Kline alleges that she heard Lee ask his assistant to change his lunch

reservations because he wanted to take a particular client to a Black-owned

restaurant, which Kline thought was offensive and discriminatory.  Id. ¶ 92; Kline

Dep. at 97-98.

### 4.      April 2015 Michael Kors Handbag Conversation

Kline also alleges that, in April 2015, Lee said that the fashion designer,

Michael Kors, was a racist and, during an alumni lunch, Lee picked up Kline's

Michael Kors handbag and said, "who's the racist with the Michael Kors bag?"

Pl.'s Resp. to Def.'s SMF ¶ 84; Kline Dep. at 84-88.  Lee denies making any

statement about Michael Kors being racist and/or saying that the owner of a

Michael Kors handbag was racist.  Pl.'s Resp. to Def.'s SMF ¶ 85.

### 5.    October 2015 Unveiling of Wilkins's Statue

Kline alleges that, in October 2015, Lee described the ceremony unveiling the statue of Wilkins by saying that Lee just threw Wilkins "the biggest black bat mitzvah." Pl.'s Resp. to Def.'s SMF ¶ 86; Kline Dep. at 88-89. Lee does not recall describing the statue unveiling as "the biggest black bat mitzvah," but does not deny that this could have occurred because he recalled having a conversation with someone else who used similar terms that he may have repeated. Pl.'s Resp. to Def.'s SMF ¶ 87.

### 6.    February 2017 "Blacks for Trump" Comment

Kline alleges that, in early February 2017, prior to her meeting with Shaw, she overheard a conversation between Lee and Shaw regarding a historically Black college with a "Blacks for Trump" group in which Lee allegedly stated that the members must be "just a bunch of white people in Black face." Id. ¶ 93; Kline Dep. at 98-99. Kline believes Shaw also engaged in discriminatory conduct because Shaw allegedly laughed at Lee's comment regarding "white people in Black face." Pl.'s Resp. to Def.'s SMF ¶ 94; Kline Dep. at 101. Both Lee and Shaw admit having a conversation regarding the "Blacks for Trump" group but deny any statement regarding "white people in Black face." Pl.'s Resp. to Def.'s SMF ¶ 95.

### B.     Kline's Internal Complaints

#### 1.     October 2015 Complaint to Human Resources

In October 2015, Kline complained to the Hawks' human resources department regarding her concerns about Lee.  Id. ¶ 97; Kline Dep. at 109, 181-82, & Ex. 16.  In this complaint, Kline reported her concerns prior to October 2015 regarding Lee and the alleged discriminatory treatment within the department. Pl.'s Resp. to Def.'s SMF ¶ 98; Kline Dep. at 110-11, 142, Ex. 16.  It is undisputed that Lee did not treat Kline differently or adversely after Kline's initial complaint and that Lee was involved in Kline's promotion to Manager in the summer of 2016.  Pl.'s Resp. to Def.'s SMF ¶ 104; Kline Dep. at 74, 82.  Between October 2015- February 2017, Kline made no further complaints to the human resources department about Lee's alleged discriminatory conduct or comments.  Pl.'s Resp. to Def.'s SMF ¶ 106; Kline Dep. at 142-43.

#### 2.     Complaints to Wilkins

At some point prior to her October 2015 complaint to the human resources department, Kline made many complaints to Wilkins regarding her dissatisfaction with her department; specifically, Kline complained to Wilkins that Lee "was discriminating against her by treating Black female employees better than he treated her," and "by giving them more support than he gave to Kline."  Pl.'s

Statement of Add'l Material Facts ("Pl.'s SAMF") [Doc. 26] ¶ 30; Def.'s Resp.

Pl.'s Add'l MF ¶ 32; Decl. of Margo Kline (Apr. 17, 2019) ("Kline Decl.") [Doc.

26-1] ¶¶ 20-22.  Kline also alleges she told Wilkins that she was unhappy when

Ferrell was given the Manager position when Kline was the one doing the work,

and also "shared with Wilkins Lee's racially charged comments."  Pl.'s SAMF

¶ 30; Kline Decl. ¶¶ 20-22.  According to Kline, Wilkins told her to report her

complaints to the human resources department, which is the reason Kline

complained to that department in October 2015.  Def.'s Resp. Pl.'s Add'l MF ¶ 32;

Kline Dep. at 114-15.

### 3.    Complaints to Carter

Kline also alleges that she reported her concerns about Lee to Carter in

March 2015, but Carter dismissed her concerns, saying Kline just needed to get to

know him.  Pl.'s Resp. to Def.'s SMF ¶ 96; Kline Dep. at 90-91.  Specifically,

Kline complained that Lee would "continually" treat women in a demeaning

fashion, and that this happened "every time we had an alumni meeting," maybe on

"five separate occasions."   Kline Dep. at 90-91; see also id. at 97 (complaining

that Lee always called women "kid").  Kline told Carter that the way Lee treated

and interacted with her was condescending and demeaning.  See id. at 90-97 ("So I

just felt I was never heard within the department, that I was always dismissed.").

### 4.   February 3, 2017, Complaint to Shaw

Kline contends that, during the February 3, 2017, meeting scheduled to discuss Kline's performance and role in the department, she advised Shaw about "her concerns about racial discrimination within the department."  Pl.'s SAMF ¶ 51; Kline Dep. at 158.  According to Kline, she "raised all of her concerns about Lee and how she felt she was being discriminated against in the department, and how there were patterns of mistreatment."  Def.'s Resp. Pl.'s Add'l MF ¶ 52; Kline Dep. at 105 (testifying that she told Shaw "[t]here's multiple instances within the organization," and also that she "raised all of my concerns about David [Lee] and how I felt I was mistreated within my department, how there were patterns of mistreatment.").  Kline contends that she complained to Shaw about "discriminatory situations" and "discrimination issues I was having."  Pl.'s Resp. to Def.'s SMF ¶ 99; Kline Dep. at 102, 113.  Kline also told Shaw that she believed the conversation Lee had with Shaw regarding the "Blacks for Trump" group was discriminatory.  Pl.'s Resp. to Def.'s SMF ¶ 107; Kline Dep. at 101-06.  Kline contends that Shaw stated "that could be a lawsuit" after Kline told Shaw about her belief that the "Blacks for Trump" conversation was discriminatory.  Pl.'s Resp. to Def.'s SMF ¶ 107; Kline Dep. at 106.  The "pattern" of discriminatory conduct and mistreatment Kline told Shaw included a complaint that Wes Wilcox, the Hawks

General Manager, made discriminatory comments about his African American wife and mixed-race children.  Kline Dep. at 103-05 (testifying about Wilcox's comment about a "brown paper bag test").

Shaw denies that she and Kline discussed race or discrimination during their February 2017 performance-related meeting and specifically denies saying "that could be a lawsuit."  Pl.'s Resp. to Def.'s SMF ¶ 109.   According to Shaw, if someone had complained about "racially charged" jokes or comments in the workplace, she would have taken the complaint seriously.  Def.'s Resp. Pl.'s Add'l MF ¶ 50.

### C.    Events Preceding  Kline's Termination

In late 2016 or early 2017, Wilkins told Lee that Kline was constantly complaining and making negative statements about the Hawks organization as a whole, that it made him uncomfortable, and that he would like someone else to handle his affairs.  Pl.'s Resp. to Def.'s SMF ¶ 50; Tr. Dep. of David Lee (Jan. 25, 2019) ("Lee Dep.") [Doc. 21-6] at 97 (testifying that Wilkins told Lee about his dissatisfaction with Kline in October or November of 2016).  Kline does not dispute that Wilkins complained about her to Lee.  Pl.'s Resp. to Def.'s SMF ¶ 50; see also Pl.'s SAMF ¶¶ 64 ("Shaw testified that not long after that meeting on February 9, 2017, Wilkins approached her regarding his displeasure with Kline

overseeing him and asking Shaw to assign someone else to him."), 65 ("Shaw also testified that Wilkins told her over and over, in several conversations, that he wanted Kline removed from her role being responsible for him.").  It is undisputed that Wilkins's complaint to Lee was the only performance issue regarding Kline that Lee ever discussed with Carter or Shaw.  Pl.'s Resp. to Def.'s SMF ¶ 51.

In the fall of 2016, Lee and Koonin made a collaborative decision to place the Community Group (which included Kline's department) under Shaw's management and to promote Shaw to Senior Vice President, Corporate Social Responsibility, effective October 24, 2016.  Pl.'s Resp. to Def.'s SMF ¶ 45.  Carter continued to be Kline's direct manager, but Carter now reported directly to Shaw instead of Lee.  Id. ¶ 46.

In January 2017, Shaw scheduled individual meetings with all of the employees newly placed under her management, including Kline.  Id. ¶ 47. According to Shaw, Kline spent the entire time during her individual meeting discussing all of the things Kline perceived to be wrong with the Hawks during her employment.  Id. ¶ 48.  Shaw testified that Kline had a negative, unpleasant disposition, and appeared to be unhappy every day.  Tr. Dep. of Nzinga Shaw (Jan. 31, 2019) ("Shaw Dep.") [Doc. 21-7] at 44.  Shaw described Kline as a "mediocre" employee who only did the bare minimum of what was required of her and

testified that had Shaw been managing the group prior to Kline's promotion to Manager, Shaw would not have approved the promotion.  Pl.'s Resp. to Def.'s SMF ¶ 53; Shaw Dep. at 48, 58-59.  Shaw testified that Kline spent her time on the Council complaining about its actions, but never offering any ideas about how the Council should be improved.  Shaw. Dep. at 49-50.[2]

Kline contends that, after she suggested Shaw was "involved in the racially discriminatory remark" during the February 3 meeting, Kline noticed a change in Shaw's "demeanor" toward Kline.  Pl.'s SAMF ¶ 56; Kline Decl. ¶ 30.  On February 8, 2017, Kline felt "blindsided and bombarded" because Shaw held a department meeting in which the alumni program was discussed without informing Kline that her area of responsibility would be discussed.  Pl.'s Resp. to Def.'s SMF ¶ 54; Kline Dep. at 143-47 & Ex. 11.  On  February 9, 2017, Shaw asked to meet with Kline to discuss Kline's concerns and told Kline that she should be prepared to discuss her area of responsibility without prior notice.  Pl.'s Resp. to Def.'s SMF ¶ 55; Kline Dep. at 148-150.  It is accepted protocol for the Hawks to have

---

[2] Kline disputes this characterization and contends that Shaw "praised her efforts" while working on the Council.  Pl.'s Resp. to Def.'s SMF ¶ 33; Shaw Dep. at 125-47 & Ex. 4.  Kline also contends that she "cherished and proud of her role" on the Council and never complained to Shaw about it until she had the one-on-one meeting with Shaw on February 3, 2017.  Pl.'s SAMF ¶¶ 41-42, 52; Kline Decl. ¶ 27.

meetings in which subject matter experts, with or without prior notice, are expected to discuss topics within their areas of expertise.  Pl.'s Resp. to Def.'s SMF ¶ 56.

On February 10, 2017, Shaw sent an email to Carter and the human resources department titled "thank you, next steps re: Margo Kline."  Def.'s Resp. Pl.'s Add'l MF ¶ 70; Shaw Dep., Ex. 12.  Shaw wrote in that email that Kline would return to work on February 21, and further stated, "I will provide you with written documentation regarding my assessment early next week, and we can plan on delivering the final warning shortly after February 21st."  Def.'s Resp. Pl.'s Add'l MF ¶ 71; Shaw Dep., Ex. 12.

### 1.    February 21, 2017 "Final Written Warning" Letter

On February 21, 2017, Kline was given a "Final Written Warning" outlining Kline's lack of collaboration and self-awareness, in addition to interpersonal skills and communication concerns, including her constant complaining and unprofessional and derogatory comments made to others about the organization and its management.  Pl.'s Resp. to Def.'s SMF ¶ 57; Shaw Dep. at 166-67; id., Ex. 16 ("Final Written Warning") [Doc. 21-7 at 383-386]; Lee Dep. at 263-64 & Ex. 17.  Of the utmost concern was Wilkins's specific request to no longer work with Kline.  Pl.'s Resp. to Def.'s SMF ¶ 57; Final Written Warning; Lee Dep. at 263-64.

According to Defendant, also of concern was the "toxic environment" that Kline was creating in the culture of the department with her behavior. Pl.'s Resp. to Def.'s SMF ¶ 59; Shaw Dep. at 97-98. Kline denies that she created a "toxic environment" and contends that Shaw had not been the leader of her department long enough to determine whether Kline created a "toxic environment." Pl.'s Resp. to Def.'s SMF ¶ 59; Shaw Dep. at 151-52 (indicating that Shaw came back from maternity leave on January 17, 2017, to start her new role as the leader of the department). Kline also contends that the Hawks had not received any complaints about her performance prior to the time she received the Final Written Warning in February 2017. Def.'s Resp. Pl.'s Add'l MF ¶¶ 20, 74; Kline Decl. ¶ 23; Tr. Dep. of Tabala Dixon (Jan. 30, 2019) ("Dixon Dep.") [Doc. 21-4] at 39-40, 49 (testifying that Human Resources had not received any complaints about Kline prior to February 2017, and she had not received any prior discipline before the Final Written Warning).

The Final Written Warning was addressed to Kline from Shaw and stated: "The purpose of this final written warning is to follow up on our conversation regarding ongoing deficiencies in your conduct." Def.'s Resp. Pl.'s Add'l MF ¶ 76; Final Written Warning; Shaw Dep. at 166-67. It also stated: "Lastly, in a previous conversation between you and I, you used the time to complain about

everything you view as inadequate in our organization surrounding your role, compensation, lack of opportunity, and overall unhappiness." Def.'s Resp. Pl.'s Add'l MF ¶ 83; Shaw Dep. at 189-90; Final Written Warning. The Final Written Warning also stated: "I will be scheduling periodic meetings with you, and Andrea will meet you weekly to evaluate your progress. I'm available to discuss any of the following areas for improvement." Def.'s Resp. Pl.'s Add'l MF ¶ 85; Shaw Dep. at 190; Final Written Warning.

It is undisputed that Shaw did not schedule periodic meetings with Kline following the issuance of the Final Written Warning. Def.'s Resp. Pl.'s Add'l MF ¶ 86. Kline contends that she tried to meet with Shaw to discuss the Final Written Warning, but "Shaw avoided her." Def.'s Resp. Pl.'s Add'l MF ¶ 86; Shaw Dep. at 221-24 (acknowledging that she received an email from Kline asking to meet, but she was "off site" and did not meet with Kline), Email from Kline to Shaw (Feb. 24-27, 2017) [Doc. 21-7 at 470-73]. Shaw testified that she did not meet with Kline because, "I do not feel like my time, which I find to be very valuable, should be spent with a person who is being manipulative versus a person who actually wants to do better and change." Def.'s Resp. Pl.'s Add'l MF ¶ 87; Shaw Dep. at 229. Shaw testified that she had a sense that Kline "did not want to get a remedy out of these meetings, but she likely wanted to manipulate my words or in

some way do or say something that would ultimately get us to the place where we ended up anyway."  Def.'s Resp. Pl.'s Add'l MF ¶ 88; Shaw Dep. at 230.

The Final Written Warning also stated: "Should your conduct not meet the required improvement by the review date or if there is any further misconduct/ cause for complaint of a similar nature, further disciplinary action will be taken, up to and including termination."  Def.'s Resp. Pl.'s Add'l MF ¶ 89; Final Written Warning.  It is undisputed that no review date was ever mentioned or set.  Def.'s Resp. Pl.'s Add'l MF ¶ 90; Shaw Dep. at 198.

The Final Written Warning was finalized on or about February 13, 2017, and given to Kline on February 21, 2017.  Def.'s Resp. Pl.'s Add'l MF ¶ 91; Shaw Dep., Ex. 12, 13, 16.  Kline was out of the office on pre-approved vacation starting February 13, 2017, and she returned to work on February 21, 2017.  Def.'s Resp. Pl.'s Add'l MF ¶ 92; Shaw Dep. at 160.  Shaw knew that Kline was out of the office during that time, because she wrote in an email on February 10, 2017, discussing the Final Written Warning, "Andrea just informed me that Margo will be gone all next week and returning to work on the 21st."  Def.'s Resp. Pl.'s Add'l MF ¶ 93; Shaw Dep. at 160.  After Kline received the Final Written Warning, Carter conducted periodic performance meetings with Kline, which Kline secretly recorded.  Pl.'s Resp. to Def.'s SMF ¶ 66; Kline Dep. at 166-67.

17

### 2.     February 15, 2017, Department Meeting

While Kline was out of the office on pre-approved vacation, on February 15, 2017, Shaw held a department meeting in which she announced a challenge (the "MOSAIC Panel Challenge") in which a request was made to everyone in the department to submit ideas for an upcoming diversity panel, and that the person whose ideas were chosen would win a prize.  Def.'s Resp. Pl.'s Add'l MF ¶ 94; Shaw Dep. at 162-63, Ex. 15.  That same day, Shaw sent an email to the department "as a friendly reminder" about the challenge.  Def.'s Resp. Pl.'s Add'l MF ¶ 95; Shaw Dep., Ex. 15.  The meeting and email occurred while Kline was on vacation and before she had been given the Final Written Warning.  Def.'s Resp. Pl.'s Add'l MF ¶ 96; Shaw Dep., Ex. 15, 16.  Kline did not send in any ideas in response to the MOSAIC Panel Challenge and, as a result, on March 8 or 9, 2017, the decision was made to terminate Kline's employment.  Def.'s Resp. Pl.'s Add'l MF ¶¶ 97-98; Dixon Dep. at 142.  At her deposition, Shaw was asked, "Did you ever consider that her being out of town might have affected her memory that she needed to do that, and so give her a reminder about it all and say, hey, you're the only person I haven't heard from on this Mosaic challenge?"  Def.'s Resp. Pl.'s Add'l MF ¶ 99; Shaw Dep. at 162-63.  Shaw responded, "No.  She had a direct

manager, Andrea Carter . . . So Andrea could have and should have followed up with her."  Def.'s Resp. Pl.'s Add'l MF ¶ 100; Shaw Dep. at 163.

### 3.    March 13, 2017, Termination

Kline's employment was terminated on March 13, 2017.  Pl.'s Resp. to Def.'s SMF ¶ 68.  According to Defendant, Kline was terminated after she failed to provide any input or response to a "direct request" from Shaw to provide two potential names for each panel and two questions for each of the panelists on the MOSAIC Panel Challenge.  Pl.'s Resp. to Def.'s SMF ¶ 68; Kline Dep. at 175-76, Ex. 13-14; Dixon Dep. at 65-68, 86, 136-37; Shaw Dep. at 118-19 (indicating that Kline was the only employee in the department not to respond to the request); Carter Dep. at 79-80, 122-23.  Kline admits that she did not provide any input or respond to an email from Shaw regarding the panelists, but she denies that there was a "direct request" for her to provide any response and notes that the email was sent when she was on vacation.  Pl.'s Resp. to Def.'s SMF ¶ 68; Kline Dep. at 174-77.

It is undisputed that Kline was the only person in the department who did not respond to Shaw's request.  Pl.'s Resp. to Def.'s SMF ¶ 69.  It is also undisputed that Kline was on paid leave when Shaw sent this request on February 15, 2017, prior to the issuance of the Final Written Warning.  Pl.'s Resp. to Def.'s

SMF ¶ 70.  Kline also asserts that she believed a response to Shaw's MOSAIC

Panel Challenge was optional.  Pl.'s Resp. to Def.'s SMF ¶¶ 70-71; Kline Dep. at

175-77.  Defendant contends, however, that Shaw's request was not optional, and

that Shaw asked for all MOSAIC Panel Challenge input to be provided on or

before February 24, 2017, three days after Kline's return from vacation and her

receipt of the Final Written Warning.  Pl.'s Resp. to Def.'s SMF ¶ 72; Kline Dep,

Ex. 13; Shaw Dep. at 118-21, 163 (testifying that Kline returned from vacation and

had "ample amount of opportunity to reach out and understand what the

assignment was if she was unclear").

Shaw interpreted Kline's failure to respond to her request as a blatant show

of disrespect and an egregious level of disengagement after Kline had just received

a warning and feedback regarding her lack of collaboration and teamwork.  Pl.'s

Resp. to Def.'s SMF ¶ 73; Shaw Dep. at 119; Carter Dep. at 79-80, 132-35.  Kline

denies that her failure to respond was a "show of disrespect and disengagement,"

because Shaw was aware that Kline was on a week-long vacation when the email

was sent.  Pl.'s Resp. to Def.'s SMF ¶ 73; Shaw Dep. at 157, Ex. 12.

The decision to terminate Kline's employment was made by Carter in

collaboration with Shaw and the human resources department.  Pl.'s Resp. to

Def.'s SMF ¶ 75; Lee Dep. at 283-84; Dixon Dep. at 64-65, 68; Shaw Dep.

20

at 225-26.  It is undisputed that Kline's position was never filled after her

termination; the department restructured the role and job description and hired a

Senior Manager, Corporate Social Responsibility in December 2017, which was

nine months after Kline's termination.  Pl.'s Resp. to Def.'s SMF ¶ 120; Carter

Dep. at 128-31, Ex. 19-20; Shaw Dep. at 244-45; Dixon Dep. at 102-03.

### D.    The Complaint

Based on the foregoing facts, Kline asserts the following claims pursuant to

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

("Title VII"): (1) race discrimination based on disparate treatment; (2) race

discrimination based on harassment; (3) sex discrimination based on disparate

treatment; (4) sex discrimination based on harassment; and (5) retaliation for

complaining about race and/or sex discrimination.  See Compl. [Doc. 1] ¶¶ 25-30

("Count One").  Kline also asserts the following claims pursuant to 42 U.S.C.

§ 1981: (1) race discrimination based on disparate treatment; (2) race

discrimination based on harassment; and (3) retaliation for complaining about race

discrimination.  See Compl. ¶¶ 31-36. ("Count Two").

### E.    The R&R

The Magistrate Judge recommends (1) granting Defendant's Motion for

Summary Judgment on Kline's claims of race and sex discrimination, based both

21

on disparate treatment and harassment, asserted under both Title VII and § 1981,

R&R at 46-47; and (2) denying Defendant's Motion for Summary Judgment on

Kline's claims of retaliation under Title VII and § 1981, R&R at 47-89.

## II.   STANDARD OF REVIEW

In reviewing a Magistrate Judge's R&R, the district court "shall make a de

novo determination of those portions of the report or specified proposed findings or

recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  "Parties

filing objections to a magistrate's report and recommendation must specifically

identify those findings objected to.  Frivolous, conclusive, or general objections

need not be considered by the district court."  United States v. Schultz, 565 F.3d

1353, 1361 (11th Cir. 2009) (quoting Marsden v. Moore, 847 F.2d 1536, 1548

(11th Cir. 1988)) (internal quotation marks omitted).  Absent objection, the district

court judge "may accept, reject, or modify, in whole or in part, the findings and

recommendations made by the magistrate judge," 28 U.S.C. § 636(b)(1), and need

only satisfy itself that there is no plain error on the face of the record in order to

accept the recommendation.  See United States v. Slay, 714 F.2d 1093, 1095 (11th

Cir. 1983).  Further, "the district court has broad discretion in reviewing a

magistrate judge's report and recommendation"—it "does not abuse its discretion

by considering an argument that was not presented to the magistrate judge" and

"has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." Williams v. McNeil, 557 F.3d 1287, 1290-92 (11th Cir. 2009).  In accordance with 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the Court has conducted a *de novo* review of those portions of the R&R to which objections have been made and has reviewed the remainder of the R&R for plain error.  See Slay, 714 F.2d at 1095.

## III.   ANALYSIS

No party objects to the Magistrate Judge's recommendation to grant Defendant's Motion for Summary Judgment as to Kline's claims of race and sex discrimination, based both on disparate treatment and harassment, asserted under both Title VII and § 1981.  In accordance with 28 U.S.C. § 636(b)(1), the Court has reviewed this portion of R&R for plain error.  See Slay, 714 F.2d at 1095.  The Court finds no plain error and that this portion of the R&R is supported by law.

Defendant objects solely to the portion of the R&R recommending its Motion for Summary Judgment be denied with respect to Kline's retaliation claims.  Def.'s Objs.  To make out a prima facie case for retaliation, Kline must allege: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the

protected activity and the adverse employment action.  Bryant v. Jones, 575 F.3d

1281, 1307-08 (11th Cir. 2009).

### A.      Protected Activity

It is undisputed that Kline engaged in protected activity when she

complained to the Hawks' human resources department in October 2015 regarding

her concerns about Lee.  Def.'s Objs. at 12 (conceding that for purposes of

Defendant's Motion for Summary Judgment, Defendants concede that Kline's

October 2015 complaint was protected activity).  However, Defendant objects to

the Magistrate Judge's finding that the following additional activity constituted

protected activity: (1) Kline's communications with Carter in March 2015;

(2) Kline's communications with Wilkins prior to October 2015; and (3) Kline's

communications with Shaw in February 2017.  See R&R at 50-64.

As a preliminary matter, the Court notes that the Magistrate Judge correctly

found that Defendant waived any arguments that complaints other than the October

2015 complaint to the human resources department were not protected activity

because Defendant was aware of the allegations in Kline's Complaint but chose

not to address this activity in its primary summary judgment brief.  R&R at 59.

Defendant does not object to the finding that it waived these arguments, but instead

requests that this Court exercise its discretion to consider its arguments regarding

24

the alleged protected activity.  Def.'s Objs. at 13.  The Court finds no clear error in the Magistrate Judge's ruling that Defendant waived these arguments.  The Magistrate Judge nevertheless considered these arguments on the merits and rejected them.  R&R at 59-64.  This Court likewise will consider Defendant's arguments related to additional conduct constituting protected activity assuming *arguendo* that Defendant did not waive them.

### 1.    Complaint to Carter in March 2015

Defendant argues that the record is undisputed that Kline's complaint to Carter in March 2015 was related to just one incident— Kline's complaint that David Lee made a sexist statement in March 2015.  Def.'s Objs. at 13-15.  Defendant argues that a complaint about "one innocuous comment" cannot constitute protected activity as a matter of law.  Def.'s Objs. at 15.

Defendant's objection is based on the premise that the March 2015 complaint to Carter was based on one comment, but the record reflects that Kline complained of numerous instances of mistreatment by Lee.  See Kline Dep. at 90-97 (testifying that Lee's mistreatment of her because she was a woman was "continual," that Lee was demeaning to her specifically "every time we had an alumni meeting," maybe on "five separate occasions," and that Lee repeatedly referred to individual women as "kid").

Accordingly, Defendant's objection that the Magistrate Judge erred in finding that Kline's complaint to Carter did not constitute protected activity is **OVERRULED**.

### 2.   Complaints to Wilkins prior to October 2015

Defendant argues that anything Kline communicated to Wilkins cannot constitute protected activity because there is no evidence that Wilkins was a manager or someone who was in a position such that notice to him constituted notice to Defendant.  Def.'s Objs. at 15-16.  Defendant also argues that Kline's general complaints to Wilkins that she was subjected to "racially charged" comments were too general to find that her report of such statements was objectively reasonable.  Id. at 16-17.

First, the Court agrees with the Magistrate Judge that the evidence presented by Kline was more than just a general complaint that she was subject to "racially charged" comments.  See R&R at 57 ("Plaintiff attests to having made express complaints about disparate treatment on the basis of race to Wilkins.").  There is evidence reflecting that Kline made many complaints to Wilkins regarding her dissatisfaction with her department and her alleged mistreatment; specifically, she complained to Wilkins that Lee "was discriminating against her by treating Black female employees better than he treated her," and "by giving them more support

26

than he gave to Kline."  Pl.'s SAMF ¶ 30; Def.'s Resp. Pl.'s Add'l MF ¶ 32; Kline

Decl. ¶¶ 20-22.

Accordingly, Defendant's objection that the Magistrate Judge erred in

finding that Kline's complaint to Wilkins was too general to constitute protected

activity is **OVERRULED**.

Second, with regard to Defendant's objection that Wilkins was not the

appropriate person to whom Kline should have reported discriminatory treatment,

Kline argues that because Wilkins reports to the CEO, he was an Executive

Committee member and pursuant to the Hawks' internal policies, it was

appropriate for Kline to report discriminatory behavior to Wilkins.  Pl.'s Resp. to

Def.'s Objs. to Magistrate Judge's R&R ("Pl.'s Resp. to Objs.") [Doc. 46] at 11-

12; Def.'s Statement of Undisputed Material Facts Supporting Mot. for Summ. J.

[Doc. 21-2] ¶ 3 ("Employees are required to report harassment, discrimination and

retaliation and can do so by making a complaint to the direct manager, department

head, Manager or Vice-President of Human Resources, Chief Legal Officer,

Executive Committee member or the Chief Executive Officer of the

organization."); see also Team Member Policy Manual [Doc. 21-7 at 387-467] at

62.  As evidence that Wilkins was an Executive Committee member, Kline relies

exclusively on the deposition testimony of Shaw in which she said that "Executive Committee members are people that report directly to the CEO."  Shaw Dep. at 29.

While it is undisputed that Wilkins reported directly to the CEO, Def.'s Resp. Pl.'s Add'l MF ¶ 22, the evidence before the Court also indicates that Wilkins was not on the Executive Committee.  Shaw was asked this precise question and unequivocally testified that Wilkins was not on the Executive Committee.  Shaw Dep. at 29; see also Def.'s Resp. Pl.'s Add'l MF ¶ 22.  It is also undisputed that Wilkins was not a decision-maker with regard to Kline's employment and there is no evidence that Wilkins was designated by Defendant as someone to whom employees should report harassment or discrimination.  See Pl.'s Resp. to Def.'s SMF ¶ 17 ("Mr. Wilkins was never her supervisor and he did not provide input into her performance evaluations or any disciplinary decisions.").

Nevertheless, Defendant has cited no authority supporting its argument that, because Wilkins was not one of the designated persons to receive official workplace complaints, the Court could not consider Kline's alleged complaint to him to be a protected activity.  Moreover, given Wilkins's title and stature within the organization (the fact that he is the most famous alumni and he reported directly to the CEO, etc.) and viewing all the evidence and inferences in a light most favorable to Kline, the Court finds that there is sufficient evidence to create a

question of fact as to whether Kline's complaints to Wilkins constituted notice to Defendant and therefore constituted protected activity.

Accordingly, Defendant's objection that the Magistrate Judge erred in finding that Kline's complaint to Wilkins did not constitute protected activity is **OVERRULED**.

### 3.    Complaints to Shaw in February 2017

Defendant argues that Kline's communications to Shaw amount to general complaints of discrimination which are not sufficiently detailed to satisfy the protected activity prong.  Def.'s Objs. at 17-22.  Defendant also argues that, to the extent Kline provides details, they concern comments about race that are not directed toward her race, were not made in the context of employment, and were race neutral.  Id. at 19-20.  Finally, Defendant argues that the Magistrate Judge's finding that the February 3, 2017, complaint to Shaw was a continuation of Kline's prior complaints about a pattern of official and racial comments was erroneous because Kline did not show that the harassment was severe or pervasive.  Id. at 20-22.  The Court does not find merit in any of these objections.

The Magistrate Judge found:

Plaintiff has cited to evidence that her complaint to Shaw on February 3, 2017, included more than just a complaint about Lee's "Blacks for Trump" conversation in which he remarked that the students must be "just a bunch of white people in Black face."  Plaintiff contends that

29

she also complained to Shaw on February 3, 2017, that she no longer wanted to be a member of the Hawks' Diversity Council because she believed the organization was "talking the talk and not walking the walk" with regard to diversity. Pl. SMF at ¶¶ 42, 51-52. Plaintiff also explained to Shaw "her concerns about racial discrimination within the department." Pl. SMF at ¶ 51; Pl. Dep. at 158. According to Plaintiff, she "raised all of her concerns about Lee and how she felt she was being discriminated against in the department, and how there were patterns of mistreatment." Pl. SMF at ¶ 52; Pl. Dep. at 105 (Plaintiff testified that she told Shaw "[t]here's multiple instances within the organization," and also "raised all of my concerns about David and how I felt I was mistreated within my department, how there were patterns of mistreatment").

In Plaintiff's deposition testimony that she cites as support for these contentions, she elaborates even further regarding the scope of the complaints she made to Shaw during the February 3, 2017 meeting. See Pl. Dep. at 104-06. Plaintiff testified that, not only did she complain to Shaw about a "pattern" of mistreatment she was subjected to by Lee, she also complained to Shaw that the Hawks General Manager, Wes Wilcox, had made discriminatory comments about his African-American wife and mixed-race children. See id. at 104-05 (Plaintiff testified that she complained to Shaw that Wilcox had made a comment referencing his "light skinned mixed children and about a brown paper bag test").

R&R at 62-63. The Court agrees with the Magistrate Judge that the evidence and inferences therefrom, viewed in a light most favorable to Kline, are sufficiently detailed to satisfy the protected activity prong.

The Magistrate Judge also addressed Defendant's argument that Kline did not present any facts to establish that her complaints to Shaw were derogatory racial comments and that they were directed toward Kline:

> It is true that not every alleged discriminatory statement that Plaintiff complained about was expressly about her. But the anti-discrimination laws protect employees not just from discrete acts of disparate treatment. The laws also protect employees from racially hostile work environments, in which the workplace becomes so permeated with discriminatory intimidation, ridicule and insult so as to effectively alter the conditions of employment. More to the point here, the law also grants employees broad sanctuary to complain about the existence of a potential racially hostile work environment without fear of reprisal.

Id. at 63-64. The Magistrate Judge correctly noted that the question before the Court is not whether Shaw's alleged conduct establishes a cause of action for discrimination under Title VII or 42 U.S.C. § 1981; instead, the question is whether Kline's complaints to Shaw about a perceived pattern of discrimination at minimum qualifies as "protected activity." Id. at 64. In other words, Kline does not have to demonstrate that her complaints to Shaw prove discrimination; she only needs to show that her belief that Defendant was engaged in unlawful employment practices was in good faith and objectively reasonable in light of the all of the circumstances presented.

> [A] plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest

and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

<u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1213 (11th Cir. 2008).

The Court agrees with the Magistrate Judge that, viewed in a light most favorable to Kline, the evidence "that she expressly complained to Shaw on February 3, 2017, about 'all of her concerns about Lee and how she felt she was being discriminated against in the department, and how there were patterns of mistreatment,'" is sufficient to find that Kline's complaint to Shaw on February 3, 2017, was a protected activity for the purpose of her retaliation claim. <u>See</u> R&R at 64.

Accordingly, Defendant's objection that the Magistrate Judge erred in finding that Kline's complaint to Shaw did not constitute protected activity is **OVERRULED**.

### B.    Adverse Employment Action

It is undisputed that Kline suffered an adverse employment action when she was terminated on March 13, 2017.  R&R at 64.  However, Defendant objects to the Magistrate Judge's finding that the Final Written Warning "could also be viewed as an adverse employment action, given that it led directly [to] the termination of her employment just a short time later, on March 13, 2017.  Def.'s Objs. at 22-27 (citing R&R at 67).  Defendant argues that the evidence does not

support a finding that the Final Written Warning led to Kline's termination, but was instead the means by which Kline was put on notice of what she needed to do to correct her behavior.  Id. at 22-25 (citing the deposition testimony of Shaw and Carter).  Defendant contends that the standard of whether an action is a materially adverse employment action is if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Def.'s Objs. at 25 (quoting Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1259 (11th Cir. 2012)).  Defendant argues that the Final Written Warning was not accompanied by any negative employment consequences and, as such, amounts to nothing more than a reprimand and is not actionable as an adverse employment action.  Def.'s Objs. at 25-27.

These arguments were never made to the Magistrate Judge, either in Defendant's initial summary judgment brief or in its reply brief.  See R&R at 66-67 ("In its reply brief, the Defendant does not challenge the Plaintiff's arguments that the Final Written Warning and Shaw's 'refusal to engage' with Plaintiff after giving her the Warning were adverse employment actions.  Based on a review of the facts and evidence set forth above, the undersigned finds that Plaintiff has shown that the issuance of the Final Written Warning to her on February 21, 2017,

could also be viewed as an adverse employment action, given that it led directly

the termination of her employment just a short time later, on March 13, 2017.").

The Court in its discretion declines to consider Defendant's arguments

raised for the first time in its objection and never presented to the Magistrate

Judge. "[A]llowing new arguments and evidence to be presented after the issuance

of an R&R would frustrate the purpose of the magistrate-judge system." Moss v.

City of Atlanta Fire Dept., No. 1:14-cv-1442-WSD, 2016 WL 5539681, at *4

(N.D. Ga. May 19, 2016) (quoting Williams, 557 F.3d at 1292); see also Worley v.

City of Lilburn, 408 F. App'x 248, 253 (11th Cir. Jan. 6, 2011) (holding that

district court did not abuse its discretion in declining to consider evidence

presented for first time in objections to a recommendation to grant summary

judgment in retaliation case).

> As a panel of the Eleventh Circuit Court of Appeals has explained, this is because allowing new arguments and evidence to be presented after the issuance of an R&R would frustrate the purpose of the magistrate-judge system, which "was created to help alleviate the workload of the district judges," and because "it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate [judge], wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge." Williams, 557 F.3d at 1291-92.

Moss v. City of Atlanta Fire Dep't, No. 1:14-CV-01442-WSD-AJB, 2016 WL

5539682, at *3 (N.D. Ga. Apr. 26, 2016) (internal punctuation omitted), report and

recommendation adopted, 1:14-CV-1442-WSD, 2016 WL 5539681 (N.D. Ga. May 19, 2016).  Moreover, Defendant has not offered an explanation as to why it failed to present this argument to the Magistrate Judge.  Accordingly, the Court exercises its discretion and does not consider the argument presented for the first time through Defendant's objections as to whether the Final Written Warning constituted an adverse employment action.  Consequently, Defendant's objection to the Magistrate Judge's finding that the Final Written Warning constituted an adverse employment action is **OVERRULED**.[3]

---

[3] Even if the Court were to consider Defendant's argument, the Court finds that Final Written Warning and Defendant's actions before and after the letter was presented to Kline, considered collectively, are sufficient to create a genuine issue of material fact as to whether they constituted an adverse employment action.  See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998) (holding that "Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions.").  For example, Kline has presented evidence that: (1) Kline was never disciplined and only received exemplary reviews prior to the Final Written Warning, Dixon Dep.; (2) Defendant never established or mentioned a review date as contemplated by the Final Written Warning, Def.'s Resp. Pl.'s Add'l MF ¶ 90; Shaw Dep. at 198; (3) Shaw avoided meeting with Kline as contemplated in the Final Written Warning, Def.'s Resp. Pl.'s Add'l MF ¶¶ 8687; Shaw Dep. at 221-24, 229; and (4) Kline was terminated soon after the Final Written Warning and the stated reason is because Kline did not complete an assignment that was given to her while she was on pre-approved leave and Defendant was aware that she was on leave, Def.'s Resp. Pl.'s Add'l MF ¶¶ 91-93; Shaw Dep. at 160.

C.     **Causal Connection**

With regard to the causal connection element of Kline's retaliation claims,

the Eleventh Circuit does

> not construe the "causal link" . . . to be the sort of logical connection
> that would justify a prescription that the protected participation in fact
> prompted the adverse action.  Such a connection would rise to the level
> of direct evidence of discrimination, shifting the burden of persuasion
> to the defendant.  Rather, we construe the "causal link" element to
> require merely that the plaintiff establish that the protected activity and
> the adverse action were not wholly unrelated.

Simmons v. Camden Cty. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985).

"[A] plaintiff must generally establish that the employer was actually aware of the

protected expression at the time it took adverse employment action."  Goldsmith v.

City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  While temporal proximity

can sufficiently establish causation on its own, "the temporal relationship between

the protected activity and the adverse employment action must be 'very close.'"

Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010) (citing

Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2008)); see also

Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (Title VII case)

("[C]ases that accept mere temporal proximity between an employer's knowledge

of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima facie case uniformly hold that the temporal proximity

must be 'very close.'").  The Eleventh Circuit has found that a three-month interval is too long while a seven-week gap may sufficiently establish causation.  <u>See</u> <u>Brown</u>, 597 F.3d at 1182 (finding three-months too long); <u>Farley v. Nationwide</u> <u>Ins. Co.</u>, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding seven weeks sufficient).

Defendant argues that the Magistrate Judge erred in finding a causal connection between any protected activity and any adverse employment action in this case because there was no temporal proximity between Kline's October 2015 complaint to the human resources department and her March 13, 2017, termination.  Def.'s Objs. at 27-28.  Alternatively, Defendant argues that the time between Kline's February 3, 2017, complaint to Shaw and her termination is too removed to establish causation.  <u>Id.</u>

As this Court has found above, based on the evidence currently before the Court, viewed in a light most favorable to Kline, the Court considers Kline's February 3, 2017, complaint to Shaw as protected activity and Defendant's February 21, 2017, Final Written Warning issued eighteen days later as an adverse employment action.  This temporal proximity of eighteen days sufficiently raises the inference of a causal connection between the protected conduct and the adverse action under the facts alleged.  <u>See Farley</u>, 197 F.3d at 1337 (finding that seven

weeks between the employee's protected conduct and adverse employment decision was sufficient to infer causation).

Accordingly, Defendant's objection that the Magistrate Judge erred in finding that there was temporal proximity to establish causation is **OVERRULED**.

### D.    Pretext

The Magistrate Judge found that, viewing all the evidence in a light most favorable to Kline, she presented sufficient evidence to demonstrate that Defendant's stated reason for issuing the Final Written Warning and terminating Kline was pretextual.  R&R at 81-88.  First, the Magistrate Judge found that the suspicious timing between Kline's complaint to Shaw, the Final Written Warning, and Kline's termination alone is sufficient to establish an inference that Defendant's stated reasons were pretextual.[4]  Id. at 81-82.  Next, the Magistrate Judge points to evidence that Wilkins complained of Kline's performance in October of 2016, but Defendant fails to explain why the Final Written Warning advising Kline of this was not issued until February of 2017.  Id. at 82-83.  Third, the Magistrate Judge found that the fact that Kline never received any warning or other discipline prior to the "Final" Written Warning is contradictory.  Id. at 83.

---

[4] Defendant does not object to this finding.

Fourth, although the Final Written Warning prescribed a scenario under which Kline could improve her performance, Defendant failed to follow any of the directives that would have permitted this to happen.  Id. at 83-86.   Finally, the Magistrate Judge found that the circumstances surrounding the ultimate decision to terminate Kline's employment indicate that Defendant's stated reason was pretextual.  Id. at 86-88.

Defendant argues that the Magistrate Judge erroneously found that the following evidence demonstrated pretext: (1) Wilkins's testimony, (2) the absence of any warning prior to the Final Written Warning, (3) Defendant's failure to follow through with some of the directives in the Final Written Warning, and (4) the fact that Kline was on leave when she missed the directive that resulted in her termination.  Def.'s Objs. at 29-33.  Defendant argues that these facts are irrelevant to pretext.

### 1.   Wilkins's Testimony

Defendant argues that the time period between when Wilkins voiced his concerns about Kline to Lee (October 2016) and when the Final Written Warning was issued was much shorter than it appears, considering that Shaw did not take over the department where Kline worked until October 24, 2016, and Shaw was on maternity leave until January 2017.  Def.'s Objs. at 29-30.  Apart from arguing that

the five-month period of time between Wilkins's complaint and the Final Written Warning was not as long as it seems, Defendant does not address or attempt to explain why there was such a significant gap in time.[5]  Defendant's objection that the Magistrate Judge erred in finding that this evidence of the time gap demonstrated pretext is **OVERRULED**.

### 2.  No Warnings Were Issued to Kline Prior to the Final Written Warning

Defendant argues that it is immaterial that Kline was not disciplined prior to the Final Written Warning because the Hawks' discipline policy contemplates that a Final Written Warning can be the first corrective action.  Def.'s Objs. at 30. Defendant also argues that, although Kline had not been formally disciplined, she was coached repeatedly throughout her career.  Id. at 30-31.  Kline points out that, to the extent that she was counseled prior to the Final Written Warning, she was never counseled for "ongoing deficiencies" that are cited in the Final Written Warning.  See Pl.'s Resp. to Def.'s SMF ¶ 65; Carter Dep. at 54-55 (indicating that Carter periodically counseled Kline for managing stress, getting projects through to

---

[5] In addition to the time gap, although the wording of the Final Written Warning indicates that Wilkins reached out directly to Shaw and Carter "to request an in-person meeting with [Shaw and Carter] regarding the lack of strategic support from [Kline]"  Wilkins testified that the only person he complained to about Kline was Lee.  Compare Final Written Warning with Wilkins Dep. at 62, 66, 69, 84.

completion, and personal issues).  Kline also references the raises, promotions, and praise from her supervisors received throughout her tenure at the Hawks, arguing that this was inconsistent with the Final Written Warning's characterization of "ongoing deficiencies."  Pl.'s Resp. to Objs. at 33-34.

Although it is not dispositive, the Court finds that the evidence that Kline was never disciplined prior to the Final Written Warning is evidence that could lead a reasonable trier of fact to conclude that Defendant's stated reasons for issuing the Final Written Warning and later terminating Kline were pretextual. Defendant's objection that the Magistrate Judge erred in finding that this evidence demonstrated pretext is **OVERRULED**.

### 3.    Failure to Follow Through with Directives in Final Written Warning

Defendant argues that the fact that Shaw did not meet with Kline in between the time the Final Written Warning was issued and Kline's termination is irrelevant to any showing of pretext because (1) there was not much time for any such meetings to take place and (2) the incident where Kline failed to respond to Shaw's MOSAIC Panel Challenge leading to her termination was separate from the issues identified in the Final Written Warning.  Def.'s Objs. at 31-32.  Kline disagrees, arguing that Defendant's reasons for issuing the Final Written Warning are pretextual because "it is precisely Shaw's actions following the Final Written

41

Warning that demonstrate that she had no intention or desire for Plaintiff to succeed and meet the expectations outlined in the Final Written Warning."  Pl.'s Resp. to Objs. at 34-36.

The Final Written Warning is drafted as a memo from Shaw to Kline in which Shaw represents that "[Shaw] will be scheduling periodic meetings with [Kline]," that Shaw is "available to discuss any of the following areas of improvement," that Shaw was there "to support you and provide you guidance," and that Shaw would set a review date.  Final Written Warning.  The evidence that Shaw never followed through with any of these representations made in the Final Written Warning could lead a reasonable trier of fact to conclude that Defendant's stated reasons for issuing the Final Written Warning and later terminating Kline were pretextual.  Defendant's objection that the Magistrate Judge erred in finding that this evidence demonstrated pretext is **OVERRULED**.

### 4.    Kline Was Out of Town When She Missed Shaw's MOSAIC Panel Challenge Assignment

Defendant argues that the Magistrate Judge improperly found that the reason for Kline's termination was pretextual because Kline was out of town when Shaw issued the MOSAIC Panel Challenge directive to Kline.  Def.'s Objs. at 32-33. Defendant points out that it is undisputed that Kline received this directive, did not respond to the email, and she was the only employee who failed to respond.  Id.

at 33.  Defendant complains that the Magistrate Judge found Defendant's stated reason for terminating Kline was pretextual because Defendant failed to warn Kline that her job was in jeopardy if she failed to respond and Defendant failed to follow up with Kline after she returned from vacation.  Id.  Defendant argues that this finding amounts to the Magistrate Judge second guessing Shaw's decision to fire Kline for failing to respond to her directive.  Id.

The Magistrate Judge found that it was "all of the evidence surrounding Defendant's decision to terminate her employment" that was "further evidence indicating that the Defendant's stated reason was pretextual," not just the fact that Kline was out of town when Shaw issued the MOSAIC Panel Challenge directive to Kline.  R&R at 86.  It is undisputed that the meeting in which the directive was issued by Shaw occurred and the email reminder for such directive was sent when Kline was on pre-approved vacation, and Shaw was aware that Kline was on vacation.  Then, when Kline returned, she was issued the Final Written Warning and had three days remaining to respond to Shaw's directive.  Further, Kline was never told that responding to the directive was not optional or that her job was in jeopardy if she failed to respond.  The Magistrate Judge found that "viewing all evidence and inferences in the light most favorable to Plaintiff, Plaintiff's evidence

surrounding the MOSAIC Panel Challenge is further evidence that Defendant's stated reasons for terminating Plaintiff's employment were pretextual." R&R at 87.

The Court agrees with the Magistrate Judge. The evidence surrounding Shaw's MOSAIC Panel Challenge, Kline's failure to respond, and her termination could lead a reasonable trier of fact to conclude that Defendant's stated reasons for terminating Kline were pretextual. Defendant's objection that the Magistrate Judge erred in finding that this evidence demonstrated pretext is **OVERRULED**.

## IV.   CONCLUSION

Therefore, after consideration of Defendants' objections and a *de novo* review of the record, it is hereby **ORDERED** that Defendants' Objections [Doc. 39] are **OVERRULED**.

Accordingly, the Court **APPROVES AND ADOPTS** the Final Report and Recommendation [Doc. 35] as the judgment of the Court. It is hereby **ORDERED** that Defendant's Motion for Summary Judgment [Doc. 21] is **GRANTED IN PART and DENIED IN PART**. The Motion is **GRANTED** with respect to Plaintiff's claims of race and sex discrimination, based both on disparate treatment and harassment, asserted under both Title VII and § 1981. The Motion for

Summary Judgment is **DENIED** with respect to Plaintiff's claims of retaliation under Title VII and § 1981.

It is further **ORDERED** that the parties shall file their consolidated pre-trial order within thirty (30) days of the entry of this Order.  See LR 16.4, NDGa.

**IT IS SO ORDERED** this 26th day of March, 2020.

MARK H. COHEN
United States District Judge